Our next case for oral argument this morning is Arroy v. Clark, appeal number 25-1871. Good morning, Ms. Crabtree. Good morning. May it please the court. My name is Tricia Crabtree, and I represent the plaintiff appellant in this matter, Marco Arroy. Mr. Arroy was incarcerated at Illinois River Correctional Center when another person in custody threatened to beat him bloody. He reported this threat to defendants on the same day, and two days later, without being provided any additional protection, Mr. Arroy was violently attacked. The Eighth Amendment's protection against cruel and unusual punishment includes the obligation that prison officials protect those in custody from attacks by other incarcerated individuals, a critical protection, as it safeguards those who, given their confinement, are severely limited in ensuring their own safety. In this case, the district court erred in granting summary judgment for defendants' jump and betrayal for deliberate indifference, because a reasonable jury could very well conclude that, one, there was a substantial risk of harm that defendants had knowledge of, and, two, defendants could have easily prevented that harm but failed to do so. Ms. Crabtree, before you go further, I just want to confirm, you are only appealing the district court's ruling as to jump and betrayal, correct? Correct, Your Honor. You're not appealing the other, I won't list them all, but the other officers who were, defendants who were dismissed. That is correct, Your Honor. Thank you. Turning to my first point, defendants had knowledge of a substantial risk of harm to Mr. Roy. To begin with, a beating suffered at the hands of another person in custody, such as the attack that occurred here, clearly constitutes serious harm, as held by this court in Brown v. Buds. There's a substantial risk of that harm materializing when the plaintiff provides context that renders the threat plausible. In this case, the threat was plausible because Mr. Roy and his attacker, Darius Redd, interacted three times per day in the dining hall, which defendants themselves acknowledged, and sometimes more often when they were called out of their cells for various reasons on a call pass. There is also sufficient context to render the threat plausible where the attacker accuses the plaintiff of snitching, or in other words, reporting someone to a prison official, which was held by this court in Javis v. McLaughlin. Here, when Mr. Roy told defendants that Redd threatened to beat him bloody, he specifically informed them that Redd had a motive to attack him, which was that Redd believed Mr. Roy snitched on him for selling drugs and got him sent to segregation, which can be found in Lieutenant Jump's incident report at docket number 68. This supplied sufficient context to render the threat plausible and demonstrated that he was at a heightened risk of assault. This also demonstrated that defendants had knowledge of that risk. Notably, not only was there a substantial risk of the attack materializing, but it did materialize. A significant issue with the district court's holding was that it suggested there is no substantial risk of harm, incorrectly finding that Redd only had minimal access to Mr. Roy because they're in separate wings. However, Redd's access to Mr. Roy was not minimal, despite them being in separate wings. Again, they still interacted at least three times per day. In case versus Ahito, the attacker and the plaintiff were also in separate wings, and this court still found that there was evidence of a substantial risk of harm. In fact, in case, the attacker or the plaintiff had more protection than Mr. Roy because he was under special surveillance. So the fact that Redd and Mr. Roy were in separate wings is in no way dispositive that there was no substantial risk of harm. Moreover, the very fact that Redd did ultimately access Mr. Roy and attack him demonstrates that he did have access to him. And even if we were to characterize that access as minimal, then even minimal access was enough to allow an attack. All of these facts demonstrate that a reasonable jury viewing the evidence in Mr. Roy's favor could very well conclude that the amount of access they had to each other was enough to make the risk to Mr. Roy substantial. At the very least, there are competing conclusions that could be drawn from those facts, which precludes judgment as a matter of law. I think the real dispute here is over the adequacy of the response by these two officers. Yes, Your Honor. And if their response was reasonable as a matter of law, then summary judgment was appropriate. Yes, Your Honor, and that brings me to my second point. Defendants could have easily prevented the attack but failed to do so. But that's not the standard, that if they could have prevented it. The standard is, were their actions so inadequate for inmate safety that it was a total unconcern for inmate safety? It's not, is there more they could have done? Your Honor, in case versus Ahito, this court specifically stated that because the defendants could have easily averted the danger, either by placing one of them in segregation or preventing them from being in the same part of the prison three times per day, no more was necessary to establish deliberate indifference. And here, defendants had multiple means by which they could have easily prevented the attack. For example, investigative segregation is a remedy that was created for this exact type of situation, which allows a person to be placed in segregation while the threat is being investigated. Defendants themselves admitted that they had the ability to place Mr. Arroyo in segregation. Restrictive housing is a very common and readily available safety measure. So readily available that the warden herself even testified that when there is a safety concern, that person can always be placed in restrictive housing, always. This is in her deposition at docket number 71-5, page 35. How were the actions taken by these officers showing a total unconcern for your client's safety? Again, just having other things they could have done, the law is very clear that is not the standard for deliberate indifference. They could be negligent. That doesn't meet it. It's a heavy burden that requires more than that. Correct, Your Honor. And the Supreme Court of the United States has held that that state of mind requirement is recklessness. But this court has stated on multiple occasions that a defendant is reckless when they could have easily prevented the attack from materializing but failed to do so. That was stated in Snipes v. Detella and Case v. Ahito. And the action that needs to be taken— That may have been a descriptive statement of the facts of those cases. That's not the legal standard. Failing to choose the best course of action or to make use of available courses of action to abate the risk is not the liability standard. Correct, Your Honor. And it's not our position that they simply failed to choose the best reasonable course of action. It's that they chose no reasonable course of action at all. Well, they reported it, filed a detailed incident report, sent it up the chain of command for investigation and determined that because the antagonist was in a different wing, the likelihood of an imminent attack was not great, so no further action was necessary. That may have been a mistaken judgment. It may have been negligence. It may even have been gross negligence. That doesn't satisfy the deliberate indifference standard. Correct, Your Honor. But the action that has to be taken must be reasonably measured to reduce that particular risk of harm. And this exact situation demonstrates precisely why merely writing a report on its own does not reduce the risk of an attack. Mr. Arroy remained in danger without being provided any additional protection while the report made its way from person to person. When it comes to preventing an attack in prison, there need to be realistic protective measures that ensure physical separation. Paperwork on its own is not going to do it. And Major Petrel himself specifically testified that when there is a credible threat, that person is supposed to first be separated and then internal affairs conducts an investigation. But here they skipped a critical step, separating them. But they were in separate wings. They were in separate wings, but they still interacted at least three times per day, Your Honor, which defendants themselves acknowledged. You're into your rebuttal time if you want to save it. Yes, Your Honor. Thank you. Ms. Brown, good morning. Good morning, Your Honors, and may it please the Court. I'm Assistant Attorney General Megan Brown, and I represent the State Defendant's Appellees. This Court should affirm the District Court's grant of the defendant's motion for summary judgment because far from demonstrating a reckless, total unconcern for appellant Arroy's safety, both Lieutenant Chump and Major Petrel took reasonable steps to determine that Arroy was safe in his cell, and they escalated the report of the threat to internal affairs, the government body that is responsible for investigating threats. Because the defendants took action to ensure that Arroy was safe, they cannot have been deliberately indifferent to the threat that he received. I just want to narrow the Court's focus. There's only one main issue here in this case, and that is whether Chump and Petrel's response to Arroy's report of a threat was so inadequate as to constitute disregard of the harm to Arroy. There was no disregard here. Each defendant took specific action to ensure that Arroy was safe. Lieutenant Chump directed Arroy to file an emergency grievance. He investigated the threatening person to Arroy. Arroy did not even know inmate Red's name when he reported the threat, and Lieutenant Chump researched that. Lieutenant Chump confirmed the housing assignments of both inmates and then drafted a detailed incident report which was escalated to his shift supervisor, Petrel. Petrel then reviewed the incident report, confirmed the housing assignments of both inmates, and escalated the incident report to both the warden and internal affairs. I would just like to contest a couple of the facts that my friend on the other side stated. We don't think that there is a reasonable dispute of fact in this case about the access that Petrel and Chump believed that Red had to Arroy. May I interrupt you there, please? Yes. Because it's something I've been wondering about. I might have missed it. Were the two guards in the chow hall when all of this took place? No. Neither Petrel nor Chump were in the chow hall when this took place. In fact, Chump was not even in the prison on that day. It was a day off for him. And I think what's important for the court to remember here, if I may continue, is that there's no evidence in the record that shows that fights happened or even physical contact happened between members of B wing, where Arroy was housed, and C wing, where inmate Red, the person who eventually assaulted Arroy, was housed. Because there was no evidence that there was frequently interaction between members of these six, purportedly very segregated sections of the prison. What about during the cafeteria? Yes. During the cafeteria, there's just no evidence in the record that there was ever any physical contact between members of B wing and members of C wing in the cafeteria. And there is evidence in the record even that Arroy talks about, about the sort of physical separation between the inmates. So this has never happened before? Is that your argument? My argument is that it's not that it's never happened before. It's just that there's no evidence in the record about it happening before. Yes, there's an absence of evidence that it's happened before, Your Honor. But I will say that there are physical separations between the inmates in the chow hall. Arroy says in his deposition at page 33 that the dishroom separates the sides physically. At 37, he says that there are officers stationed in the chow hall, one in the tower, one between the sides, and then also officers outside the chow hall and other staff. And in his deposition at page 39 and also in the second part of his deposition at pages 47 through 49, he discusses extensively the security measures of how inmates from one wing are not allowed to stand up or move or maneuver around the chow hall while another wing is moving in and out of the chow hall. That's why even Arroy himself was surprised to find Red in the sort of antechamber outside of the cafeteria because he should not have been able to get up. Because they could not have anticipated what had happened here based on the record and the evidence, we would say that there was no deliberate indifference to Arroy's safety. And if this court has no further questions, we would rest on our briefs on the qualified immunity issue, and we would request respectfully that this court affirm the judgment of the district court here. Thank you, Ms. Brown. Ms. Crabtree, you have a little bit of time left. May it please the court. Appellant has one point on rebuttal. Defendants suggest that Mr. Arroy and Red were completely separated in the dining hall by this dish room and by other physical factors, but that is not accurate. Nowhere does anyone testify that a dish room completely separated the two sides and preclude them from accessing each other. Also, defendants admit in their appellate brief that it only partially separated the two sides, insinuating that they did have access to each other. And notably, the fact that Red was able to walk over to Mr. Arroy's side by the exit and attack him demonstrates that they did have access to each other in the dish hall. Therefore, Mr. Arroy's version of the facts allow a reasonable jury to conclude that they did have enough access to each other to make the risk to Mr. Arroy substantial. An appellant respectfully requests that this court similarly find that the lower court erred in granting summary judgment for defendants' jump and betrayal. Thank you. Thank you, Ms. Crabtree. Thanks to both counsel, the court will take the case under advisement.